Present:  All the Justices

MICHAEL JEROME BOLDEN

                                OPINION BY
v.  Record No. 011407       CHIEF JUSTICE HARRY L. CARRICO
                             April 19, 2002
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINA

The question for decision in this drug case is whether the Court of Appeals erred in affirming the trial court's denial of a motion to suppress evidence obtained in the search of a suitcase located in the trunk of a motor vehicle.  The question stems from a prosecution of Michael Jerome Bolden in the Circuit Court of Arlington County for the possession of more than five pounds of marijuana with the intent to distribute in violation of Code § 18.2-248.1.[1]

Following denial of the motion to suppress, the trial court, sitting without a jury, convicted Bolden of the possession charge and sentenced him to serve twelve years in the penitentiary, with nine years suspended.  In an unpublished opinion, the Court of Appeals affirmed the conviction.  We awarded Bolden this appeal.[2]

---

[1] Code § 18.2-248(A) makes it unlawful to possess a controlled substance with intent to distribute and Code § 18.2-248.1(a)(3) provides a penalty of not less than five nor more than thirty years when the controlled substance consists of more than five pounds of marijuana.

[2] The defendant was also convicted of transporting marijuana into the Commonwealth with intent to distribute in violation of

In his motion, Bolden sought to suppress "any and all evidence obtained directly or indirectly as the result of the illegal seizure of him and his effects on or about the 29th day of December 1999."  In a pretrial hearing on the motion, the evidence showed that, on the date alleged, Officer Garrett Daniel Polowy of the Arlington County Police Department, while on routine patrol in a marked police cruiser, observed the driver of a gold-colored automobile acting suspiciously.  He followed the car but lost sight of it briefly and then found it parked in front of an Oriental rug store located next door to an Econo Lodge hotel.  Polowy pulled into the hotel parking lot to keep the gold car under surveillance.

While seated in his cruiser, Polowy observed a man, who turned out to be Bolden, walking toward the hotel from the vicinity of the gold car.  Bolden seemed to be "caught . . . off guard" when he saw Polowy, who was in uniform; Bolden paused for a moment, and then walked toward the hotel entrance.  Polowy left his cruiser, walked up to Bolden, and said, "Hi, how are you doing?"  Bolden "kind of nodded his head in response."  Polowy asked Bolden why he was in the area and if he had seen the gold car or knew who had occupied it.  Bolden said he had

---

Code § 18.2-248.01 but that conviction is not before the Court in this appeal.

been a guest at the hotel, and he disclaimed any knowledge of the gold car.  The two then walked into the hotel together.

Bolden took a seat in a chair directly in front of the doors of the small lobby.  Polowy asked the clerk at the front desk whether Bolden was a guest at the hotel, and she stated Bolden had been a guest but "had just checked out."  Polowy then radioed a fellow police officer, Corporal Dean Matthews, to come to the hotel.  While awaiting Matthews' arrival, Polowy and Bolden engaged in "small talk" about the gold car.  In the same period, a telephone call for Bolden came into the front desk.  He left his seat, and the clerk handed him the cordless telephone.  He engaged in a conversation for 20 to 30 seconds and returned to his chair.

Matthews arrived shortly, in uniform, and Polowy took him aside and briefed him on the situation.  Matthews then walked up to Bolden, who was still sitting in the chair, and began talking to him.  Bolden told Matthews he was "just . . . waiting for a cousin . . . to come and show him where to go because he was going to the cousin's house."  Matthews ultimately asked to see Bolden's identification, and Bolden produced a New Mexico driver's license.  When Bolden produced the license, he stood up and then took a step or two and leaned against a railing in the lobby while he and Matthews talked.  After the license "checked out," Matthews returned it to Bolden.

3

In further questioning, Matthews asked Bolden about his relationship with the gold car, about when he got to the hotel, about where he was going, and about the cousin who was coming to pick him up. Matthews then asked Bolden whether he would consent to be searched there in the lobby, and Bolden replied affirmatively. Polowy searched Bolden, and "no contraband or anything illegal was found."

A minute or two after Matthews arrived at the hotel, another uniformed officer, Jason Bryk, appeared, and he joined Polowy and Matthews in the hotel lobby. All three officers were armed, but the weapons were never removed from their holsters during the encounter with Bolden.

During Matthews' questioning of Bolden, another telephone call came into the hotel for Bolden. Instead of handing the telephone to Bolden, the clerk handed it to Polowy, who said to the caller, "Hi, how are you doing? How can I help you?" The caller then hung up.

After the questioning of Bolden had continued for some 15 to 20 minutes, the hotel manager asked the officers to move out of the lobby, and Matthews asked Bolden to "step outside." The officers "turned and walked, and [Bolden] came with [them]." Standing "just outside the front doors," Matthews continued questioning Bolden.

4

Matthews asked Bolden where his luggage was, and Bolden said it was in his car, pointing to a vehicle located on the hotel parking lot. The officers ran a record check on the car but apparently found nothing incriminating.

Matthews looked inside the car, saw a green bag sitting on the rear seat, and asked Bolden if the bag was his. Bolden responded affirmatively, and when Matthews asked him if there were any guns or drugs in the bag, Bolden replied "no." Matthews then asked Bolden for permission to search the bag, and Bolden "just took a deep breath and put his head straight down to the ground, [and] said nothing."

Matthews next asked Bolden whether there was anything else in the car, and Bolden said there was a suitcase in the trunk. Matthews inquired whether there were "any guns, drugs, or anything like that in the suitcase," and Bolden said "no." Matthews then asked if he "could open the trunk." Bolden responded by "pulling the keys" out of his pocket and opening the trunk. When Matthews asked if he could take the suitcase out of the trunk and search it, Bolden stated "he would rather it stay in the trunk."

Because there was a "drop-off" behind the car where it was sitting at the end of the parking lot, it was difficult to reach inside the trunk, and Bolden "volunteered to move the car ahead so that [the officers] could search the suitcase." Bolden got

5

in the car, started it with his key, and "pulled it up a little bit," but the move proved to be insufficient, and, at Matthews' request, Bolden "started the car back up [and] pulled it up a little bit further."

Bolden testified that when he moved his car, one of the officers, at Matthews' direction, positioned his cruiser in front of Bolden's vehicle. Bolden also testified that another officer had placed his cruiser at the exit to the parking lot.

After Bolden moved his car, Matthews asked Bolden for permission to search the suitcase, and Bolden "just took a deep breath, and . . . put his head down." Matthews then said that if Bolden had any contraband, he, Matthews, would prefer that Bolden just give it up, rather than requiring Matthews to conduct a search. Again, Bolden "just put his head down," but finally told Matthews "[y]ou can look."

After a brief discourse by Matthews about the importance of honesty and his preference for Bolden to give him what was in the suitcase, Bolden said, "Go ahead and look, man." Matthews opened the suitcase and found a taped-up bundle of marijuana. The officers then arrested Bolden and advised him of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Bolden agreed to speak with Matthews and admitted the bundle contained fifty pounds of marijuana worth about $45,000. All in all, the

6

officers' encounter with Bolden consumed approximately 30 minutes.

In denying Bolden's motion to suppress, the trial court found that Bolden was "a mature, knowledgeable person" who "maintained a controlled demeanor and in [the] courtroom . . . showed that he has a strong presence about him and obvious intelligence." The court further found that Bolden "thought about" whether to give the police permission to search, "implying that he knew he had a choice"; the "concept that he was stopped from going about his business is rebutted by the fact that he was where he wanted to be"; "he wanted to be at the Econo Lodge waiting for [his cousin] to come to him"; "very important is the fact that he elects to open the car . . . elects to move it . . . elects to facilitate access to the trunk"; he "makes the subtle distinction between you can't look at the suitcase outside of the [trunk]"; "[h]e knew what he was doing"; and he is "a reasonable person."

On appeal, Bolden points out that Corporal Matthews admitted in his testimony that the police had no factual basis to suspect Bolden of any criminal activity. Bolden says that, notwithstanding "this total lack of suspicion of any illegal conduct, the police engaged in a series of acts which would have led a reasonable individual to believe that [he or she was] not free to leave." Hence, Bolden concludes, he was unlawfully

7

seized prior to the time he consented to the search of his suitcase and, therefore, his consent was not voluntary.

A claim by a defendant that he was seized within the contemplation of the Fourth Amendment "presents a mixed question of law and fact that is reviewed de novo on appeal." McCain v. Commonwealth, 261 Va. 483, 489, 545 S.E.2d 541, 545 (2001); see also Reittinger v. Commonwealth, 260 Va. 232, 236, 532 S.E.2d 25, 27 (2000). In considering a claim of seizure, "the appellate court is required to give deference to the factual findings of the trial court and to determine independently whether, under the law, the manner in which the evidence was obtained satisfies constitutional requirements." McCain, 261 Va. at 490, 545 S.E.2d at 545. And "[t]he burden is on the defendant to show that the denial of his suppression motion, when the evidence is considered in the light most favorable to the Commonwealth, was reversible error." Id.

"[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." United States v. Mendenhall, 446 U.S. 544, 553 (1980). Hence, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances

surrounding the incident, a reasonable person would have believed that he was not free to leave."  Id. at 554.

The Supreme Court has provided examples of circumstances indicating the occurrence of a seizure.  These examples include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id.

The Commonwealth argues that the encounter between the police officers and Bolden was entirely consensual.  "The police simply did not engage in a show of authority which would have caused a reasonable person to believe that he was not free to leave, refuse to answer questions, or refuse the officer's request to search the suitcase in the trunk."  The officers spoke to Bolden in a normal tone of voice throughout the encounter in an effort to secure his cooperation.  The officers' weapons remained holstered at all times.  Bolden readily acceded to Matthews' request for identification, and, furthermore, merely requesting identification does not constitute a seizure, McCain, 261 Va. at 491, 545 S.E.2d at 546.  Bolden also readily agreed to a search of his person.  The officers did not interfere with Bolden's purpose to remain in the lobby awaiting the arrival of his cousin, impede Bolden's ability to move about

9

the lobby during questioning, or block the lobby doors to the outside.

Continuing, the Commonwealth argues that when the parties went outside, the encounter remained consensual.  Bolden freely answered the officers' questions about the whereabouts of his car and his luggage and readily admitted the green bag on the rear seat was his.  When Bolden did not consent for Matthews to search the green bag, Matthews did not search it.  When Matthews asked whether there was anything else in the car, Bolden said there was a suitcase in the trunk.  When Matthews asked if he could open the trunk, Bolden took the key out of his pocket and opened the trunk, then voluntarily moved his car twice to facilitate Matthews' search of the suitcase.  Matthews gave Bolden the opportunity to be honest and give up any contraband that was in the suitcase in lieu of a search.  Matthews searched the suitcase only after Bolden had twice voiced his consent, and Matthews respected Bolden's wishes by searching the suitcase while it was inside the trunk rather than outside.

We find the Commonwealth's argument interesting, but it is insufficient to overcome the effect of two incidents occurring in the encounter between the police officers and Bolden.  These two incidents are the police interception of the second telephone call for Bolden and the positioning of a police

10

cruiser in front of Bolden's car when he moved it to facilitate Matthews' search of the suitcase.

With respect to the intercepted telephone call, the Commonwealth argues that there is a reasonable inference the call came while Matthews was interviewing Bolden and that it "is entirely consistent with a consensual encounter for a second officer present to intervene, attempt to determine the identity of the caller in order to tell the citizen so he can judge whether he wants to take the call, or take a message for the citizen while he is engaged in a conversation with the police." But this argument misses the point.  The point is whether such an interception would cause a reasonable person to believe he or she is not free to leave the encounter.

With respect to the positioning of the police cruiser in front of Bolden's car, the Commonwealth acknowledges on brief that Bolden testified "his vehicle was blocked in by police."[3] "[B]ut," the Commonwealth continues, Bolden "admitted that no weapons were drawn."  Again, the Commonwealth misses the point.

_____

[3] While a trial judge is not bound to accept "unworthy, albeit uncontradicted, testimony of an accused," Chesson v. Commonwealth, 216 Va. 827, 832, 223 S.E.2d 923, 926-27 (1976), "a trier of fact may not arbitrarily or without justification discredit evidence which is uncontradicted and not inconsistent with other evidence in the case," id. at 832, 223 S.E.2d at 926. Here, Bolden's testimony concerning the blocking of his car was completely uncontradicted; he was not cross-examined on the point and not one of the three police officers involved denied

Whether weapons were drawn or not is irrelevant to the question whether such blocking would cause a reasonable person to believe he or she is not free to leave the encounter.

We need not decide in this case whether either the intercepted telephone call or the blocking of Bolden's car is sufficient alone to constitute a seizure within the meaning of the Fourth Amendment. Clearly, when these two incidents are combined, there is present such a "show of authority," Mendenhall, 544 U.S. at 553, as to make a reasonable person believe he or she is not free to leave the encounter, and an illegal seizure has occurred.

Because Bolden suffered an illegal seizure, his consent to the search of his suitcase was tainted and ineffective to justify the search. Florida v. Royer, 460 U.S. 491, 507-08 (1983). Hence, the evidence obtained from the suitcase should have been suppressed. Accordingly, we will reverse the judgment of the Court of Appeals, vacate Bolden's conviction for possession of more than five pounds of marijuana, and remand the case to the Court of Appeals with direction to remand the matter to the trial court for further proceedings, if the Commonwealth be so advised.

Reversed and remanded.

_____

the blocking. Furthermore, Bolden's testimony was not inconsistent with other evidence in the case.

12