**VIRGINIA:**

In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on Friday, the 27th day of February, 2009.

Demetres Jerrod Rudolph,                                              Appellant,

  against        Record No. 080794
                   Court of Appeals No. 0240-07-1

Commonwealth of Virginia,                                              Appellee.

Upon an appeal from a judgment rendered by the Court of Appeals of Virginia.

Upon consideration of the record, briefs, and argument of counsel, the Court is of opinion that there is reversible error in the judgment of the Court of Appeals.

Demetres J. Rudolph was charged with and found guilty of possession of marijuana with the intent to distribute in the Circuit Court of the City of Virginia Beach. By an unpublished memorandum opinion, the Court of Appeals affirmed Rudolph's conviction. Rudolph claims that he was stopped in violation of his rights under the Fourth Amendment of the United States Constitution and that all evidence obtained as a result of that stop should have been suppressed. The Commonwealth contends that, under the circumstances, the police officer's investigatory stop was constitutionally permissible.

On January 23, 2006, at approximately 8 p.m., Officer Jeremy P. Latchman was patrolling the Cypress Point Plaza Shopping Center

area. Multiple burglaries of closed businesses and robberies of individuals had occurred in that area. Latchman saw a "vehicle with no lights on parked parallel in the rear of [a] Citgo Gas Station," located on an outparcel of the shopping center. The gas station was open for business, and there was an entry door for customers in the "rear," which is the side of the building that is opposite the side of the building where the gas pumps are located. Latchman thought the circumstance of the vehicle being parked in that location was unusual because he did not believe that customers used the station's rear entry in the nighttime. In addition, while there are parking spaces on that side of the building, the vehicle was not parked in a marked parking space.

There were two people in the parked vehicle. Rudolph was in the driver's seat. In the few seconds he observed the parked vehicle from about a car length and a half away from Rudolph's vehicle, Latchman saw Rudolph moving around in the vehicle and saw Rudolph's head "[go] down a couple of times and back up." Latchman testified that Rudolph appeared to be looking or reaching for something inside the vehicle. Latchman decided to drive his marked police vehicle around the gas station to "make sure everything was fine." In doing so, he did not observe anything unusual. While Latchman was circling around the gas station, Rudolph began to drive away.

Latchman stopped Rudolph's vehicle. During the stop, Rudolph was asked to exit the vehicle; marijuana was found at the center floor divider where Rudolph's right leg had been. The discovery of

2

that marijuana led to the conviction that is the subject of this appeal.

A defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review de novo on appeal. Bolden v. Commonwealth, 263 Va. 465, 470, 561 S.E.2d 701, 704 (2002). In making such a determination, we give deference to the factual findings of the circuit court, but we independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment. McCain v. Commonwealth, 275 Va. 546, 552, 659 S.E.2d 512, 515 (2008).

In order to conduct an investigatory stop, a police officer need not have probable cause; he must have a reasonable suspicion, based on objective facts, that the person is involved in criminal activity. Ewell v. Commonwealth, 254 Va. 214, 217, 491 S.E.2d 721, 722 (1997). To establish reasonable suspicion, an officer must be able to articulate more than an unparticularized suspicion or "hunch" that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000). A court must consider the totality of the circumstances when determining whether a police officer had a particularized and objective suspicion that the person stopped was involved in criminal activity. Ewell, 254 Va. at 217, 491 S.E.2d at 722-23. The fact that the stop occurred in a "high crime area"

3

is a relevant factor; however, this fact is insufficient to supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped. Wardlow, 528 U.S. at 124; McCain, 275 Va. at 552-53, 659 S.E.2d at 516.

We hold that the circumstances and actions observed by Latchman were not enough to create a reasonable articulable suspicion that criminal activity was afoot. Viewing the totality of the circumstances objectively, even though it was 8:00 p.m. and there had been robberies and burglaries in the area, the circumstances did not supply a particularized and objective basis to suspect that Rudolph's observed behavior was a precursor to a break-in, robbery, or any other criminal activity on his part. Therefore, Latchman stopped Rudolph in violation of Rudolph's rights under the Fourth Amendment. Because the marijuana was discovered as a result of an illegal stop, the trial court should have granted Rudolph's motion to suppress.

Rudolph entered a conditional guilty plea pursuant to Code § 19.2-254, which provides in part that "[i]f the defendant prevails on appeal, he shall be allowed to withdraw his plea." Rudolph has prevailed on appeal regarding suppression of the evidence in this case. He is, therefore, entitled by statute to withdraw his plea of guilty. Rudolph must be given the opportunity to reassess the admissible evidence that may be used against him

4

and, if the Commonwealth wishes to continue its prosecution, Rudolph may demand a trial if he so desires.  See Code § 19.2-254; Hasan v. Commonwealth, 276 Va. 674, 681, 667 S.E.2d 568, 572 (2008).

Accordingly, the judgment of the Court of Appeals is reversed, Rudolph's conviction in the Circuit Court of the City of Virginia Beach, case number CR06-1036, is vacated, and we will remand this case to the Court of Appeals with direction that the Court of Appeals remand the case to the circuit court for proceedings consistent with the views expressed in this order if the Commonwealth be so advised.

_____

JUSTICE LEMONS, with whom JUSTICE KINSER and SENIOR JUSTICE CARRICO join, dissenting.

The jurisprudence of the United States Supreme Court dealing with searches and seizures under the Fourth Amendment has always sought to strike the correct balance between protecting the constitutional rights of citizens and ensuring that law enforcement officers can take necessary action to protect the public and ensure compliance with the law.

I believe the majority today has misapplied the law relating to investigatory stops under the Fourth Amendment, both in discounting the cumulative effect of the circumstances encountered by the police officer here, and in misconstruing the degree of suspicion required

to justify such stops under Terry v. Ohio in a way that imposes a much heavier burden on police than the constitution warrants.

## I. Principles of Law

Under the Fourth Amendment, brief stops by law enforcement officers to investigate the possibility of criminal behavior may be justified by a lower standard of suspicion than is required for "a 'technical arrest' or a 'full-blown search,'" in the words of Terry v. Ohio, 392 U.S. 1, 19 (1968).

> The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. Because the "balance between the public interest and the individual's right to personal security" tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity " 'may be afoot.' "

United States v. Arvizu, 534 U.S. 266, 273 (2002) (citations omitted). This doctrine, which was recognized as to pedestrians in Terry, 392 U.S. at 30, has been extended to stops of vehicles whose drivers are suspected of engaging in wrongdoing. United States v. Cortez, 449 U.S. 411, 417 (1981); see also Delaware v. Prouse, 440 U.S. 648, 663 (1979). We have also recognized and applied this lower standard to vehicle stops. Jackson v. Commonwealth, 267 Va. 666, 673, 594 S.E.2d 595, 598 (2004).

While "reasonable suspicion" must be based on more than an "inchoate and unparticularized suspicion or 'hunch,' " Terry, 392 U.S. at 27, the United States Supreme Court has also made clear that the standard only requires "some minimal level of objective

6

justification" for making the stop in question, <u>INS v. Delgado</u>, 466 U.S. 210, 217 (1984) (citing <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980); <u>Terry</u>, 392 U.S. at 21). Indeed, the Court has often reemphasized the significant difference between the low threshold of "reasonable suspicion" on the one hand, and the considerably more demanding requirements of "probable cause," "a preponderance of the evidence," and "beyond a reasonable doubt" on the other. For example, in <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989), the Court noted that reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less demanding than that for probable cause." And in <u>Alabama v. White</u>, 496 U.S. 325 (1990), the Court further explained that

> reasonable suspicion is a less demanding standard
> than probable cause not only in the sense that
> reasonable suspicion can be established with
> information that is different in quantity or content
> than that required to establish probable cause, but
> also in the sense that reasonable suspicion can arise
> from information that is less reliable than that
> required to show probable cause.

<u>Id.</u> at 330.

Whether officers making an investigatory stop are presented with circumstances sufficiently suspicious to satisfy this minimum standard is determined by examining the totality of the circumstances in the context of the officer's experience and training. <u>United States v. Cortez</u>, 449 U.S. 411, 417–18 (1981). As the Supreme Court has noted, "[t]his process allows officers to draw on their own experience and specialized training to make inferences

7

from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " Arvizu, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 418).

And, as the Court has insisted since it first recognized the constitutionality of reasonable investigative stops in Terry, "it is imperative that the facts be judged against an objective standard," Terry, 392 U.S. at 21, meaning that the officer's actual conclusion in the particular case at issue is irrelevant. Instead, reviewing courts must ask: "would the facts available to the officer at the moment of the [stop] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Id. at 21–22.

This legal framework exists to guide trial courts in ruling on challenges invoking the Fourth Amendment, and to guide appellate courts in reviewing the constitutionality of those rulings. In our constitutional order, some (but not all) violations of the Fourth Amendment trigger an extreme remedy: the exclusionary rule, which, if applicable, provides that the improperly obtained evidence is inadmissible against the defendant. See, e.g., id. at 12–13.

The Supreme Court has recently reemphasized the severity of the exclusionary rule and the resulting restraint courts must show when invoking it. "[E]xclusion 'has always been our last resort, not our first impulse.' " Herring v. United States, 555 U.S. ___, ___, 129 S.Ct. 695, 700 (2009) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). " '[T]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application.' " Id. at ___, 129 S.Ct. at 701 (quoting

8

Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 364-65 (1998)).

The "major thrust" of the rule is "a deterrent one," Terry, 392 U.S. at 12 (citing Linkletter v. Walker, 381 U.S. 618, 629-35 (1965)), targeting "police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires," id. at 15. In contrast, the rule is abused where it is "invoked to exclude the products of legitimate police investigative techniques." Id. at 13.

When applied to evidence recovered pursuant to an investigatory stop, the exclusionary rule is best equipped to deter stops made not because of legitimate suspicion, but because the stop was motivated by some pernicious reason (such as racial profiling, personal animus, or the like), or by arbitrariness evidencing a genuine abuse of police power. Such a wrongful basis for the stop warrants the application of the exclusionary rule's severe penalty.

But not all investigatory stops arise from such base motivations. Indeed, the Supreme Court has explicitly recognized that conduct observed by police may be "ambiguous and susceptible of an innocent explanation" and yet still justify an investigatory stop, allowing the officers to "detain the individuals to resolve the ambiguity." Illinois v. Wardlow, 528 U.S. 119, 125 (2000). The Court in Wardlow continued:

> In allowing such detentions, Terry accepts the risk
> that officers may stop innocent people. Indeed, the
> Fourth Amendment accepts that risk in connection with
> more drastic police action; persons arrested and

9

> detained on probable cause to believe they have
> committed a crime may turn out to be innocent.  The
> <u>Terry</u> stop is a far more minimal intrusion, simply
> allowing the officer to briefly investigate further.
> If the officer does not learn facts rising to the
> level of probable cause, the individual must be
> allowed to go on his way.

<u>Id.</u> at 126.  Applied injudiciously, the exclusionary rule improperly deters this kind of legitimate police conduct, conduct that strikes the appropriate balance between respecting the privacy citizens enjoy under our Constitution, and preserving the state's interest in preventing crime.

II. Error in Application of Law to Facts

The majority today holds that the circumstances here were insufficient to provide a reasonable suspicion for the stop that led to Rudolph's arrest.  In my view, the majority has reached the incorrect conclusion given the facts of this case, in part because it ignores repeated admonishments from the United States Supreme Court and our prior cases that the constitutionality of such stops must be evaluated by examining the collective weight of the totality of the circumstances.

Here, at least four circumstances could have reasonably lent support to Officer Latchman's conclusion that criminal activity may have been afoot.  First, the encounter at issue here occurred in the parking lot of a shopping center that had recently experienced a significant rise in criminal activity.  As the Supreme Court has held, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further

10

investigation. . . . [T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis."  Wardlow, 528 U.S. at 124 (citing Adams v. Williams, 407 U.S. 143, 144, 147-48 (1972)).  And indeed, the majority here concedes that "[t]he fact that the stop occurred in a 'high crime area' is a relevant factor" in the reasonable suspicion analysis.  In the period leading up to this encounter, police "had beefed up a lot of extra patrol and a lot of overtime due to the fact that there w[ere] a lot of break-ins and robberies in that specific shopping center."

Second, the location of the car was unusual, and inconsistent with where and how a typical patron of the service station would be parked.  The car was located on the side of the building opposite the gas pumps and main entrance to the station.  Furthermore, the car was "parked parallel," not in any of the marked spaces nearby.  This location was particularly odd because of the time of day; although there was a door to the station on that side of the building, in the officer's experience (unquestionably a permissible consideration in evaluating reasonable suspicion), such back doors were rarely if ever used by customers, especially at night.  Finally, although it was after dark, the car's lights were off.

Third, the "furtive gestures" of the car's occupants could reasonably have raised questions about their activities and intent.  We have previously recognized that furtive gestures are relevant in determining whether probable cause exists for an arrest, see, e.g.,

11

Hollis v. Commonwealth, 216 Va. 874, 877, 223 S.E.2d 887, 889 (1976), and therefore they are unquestionably relevant when evaluating the lesser standard of reasonable suspicion. Here, when the officer pulled his vehicle within approximately one and a half car lengths behind the parked car, he observed two individuals within. The driver, who later turned out to be Rudolph, was "moving around in the vehicle" in a way that suggested to the officer that he might be "looking around for something." The other occupant was also "moving around in the vehicle;" the officer described the occupants' actions as "furtive movements," "reaching for stuff," and "ben[ding] down a couple of times."

Finally, the occupants' decision to depart the parking lot after encountering the officer could have been reasonably interpreted as evasion, or at least raised the possibility that was their motive. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124 (citing United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975); Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (per curiam); Sokolow, 490 U.S. at 8-9). This is especially true when coupled with other factors. See, e.g., United States v. Briggman, 931 F.2d 705, 709 (11th Cir. 1991) (defendant was parked in lot adjacent to closed businesses and attempted to evade police); Losee v. Dearinger, 911 F.2d 48, 49-50 (8th Cir. 1990) (defendants were parked illegally

12

behind closed business in high-crime area, and attempted to evade police).  Here, after observing the car from close distance, the officer decided to "go around the vehicle" and around the gas station building to "make sure everything was fine."  As he rounded the building on the opposite side from where Rudolph was parked, the officer immediately saw the parked car starting to drive away.

It is of course true that each of these circumstances might be wholly innocent.  Indeed, when viewed in isolation from one another, it is doubtful that any of them could provide police with a reasonable suspicion that criminal activity may be afoot.  However, engaging in such an exercise, as the majority implicitly does, ignores the correct application of a totality-of-circumstances test. As the Supreme Court has made clear,

> Terry, however, precludes this sort of divide-and-conquer analysis.  The officer in Terry observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another.  Although each of the series of acts was "perhaps innocent in itself," we held that, taken together, they "warranted further investigation." 392 U.S. at 22.  See also Sokolow[, 409 U.S.] at 9 (holding that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion).

Arvizu, 534 U.S. at 274-75.  The point, again, is that when viewed together, circumstances – even if wholly innocent – may be suspicious enough to warrant a reasonable officer in conducting a Terry stop in order to "resolve the ambiguity."  Our cases are in perfect accord on this point.  See, e.g., Moore v. Commonwealth, 276 Va. 747, 757, 668 S.E.2d 150, 156 (2008); Harris v. Commonwealth,

13

276 Va. 689, 695-98, 668 S.E.2d 141, 145-47 (2008); <u>Buhrman v. Commonwealth</u>, 275 Va. 501, 505, 659 S.E.2d 325, 327 (2008); <u>Bass v. Commonwealth</u>, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000). Viewed together, the circumstances here could reasonably be considered suspicious.

In a remarkably similar case, <u>United States v. Dawdy</u>, 46 F.3d 1427 (8th Cir. 1995), the Court of Appeals for the Eighth Circuit considered a <u>Terry</u> stop based on an officer's observation of a vehicle parked, late at night, behind a closed pharmacy at which there had been prior reported false burglary alarms. 46 F.3d at 1428. The car's lights were off but it was occupied, and when the officer entered the parking lot to investigate, the driver of the car started the vehicle and began to drive toward the exit of the lot, at which point officers stopped the car to investigate. <u>Id.</u> at 1428-29. The Eight Circuit held that the stop was valid, emphasizing "not merely the presence of two men sitting in a parked automobile at night," but also the prior suspicious activity in the area, the occupants' apparent lack of a legitimate business purpose, and the occupants' potentially evasive behavior. <u>Id.</u> at 1430.

The similar circumstances here suggest the same result. Like the occupants in <u>Dawdy</u>, Rudolph and his companion were parked, late at night and with the lights off, behind a business. In <u>Dawdy</u>, there had merely been prior false burglary alarms, which could be seen as less suspicious than the confirmed robberies and break-ins here. In both cases, the likelihood of a legitimate business purpose was slight: in <u>Dawdy</u>, the officer reasonably believed the

14

pharmacy was closed, while here Officer Latchman knew from experience that gas station customers seldom used back entrances, especially at night. When they encountered law enforcement officers, both sets of occupants attempted to make a quick exit. And the furtive gestures of Rudolph here – a factor not present in Dawdy, in which the stop was deemed valid – lends further support to the reasonableness of the stop here.

### III. Error in Legal Standard Applied

In this case, the majority's error may reach deeper than merely misunderstanding the way the circumstances here work together to provide a reasonable suspicion. In reaching its conclusion, the majority appears to have applied a more exacting legal standard than the Fourth Amendment permits, declaring legitimate police activity unconstitutional and upsetting the delicate balance between individual privacy and community safety.

It is possible that this divergent standard has its genesis in a slight discrepancy in the language used by the United States Supreme Court, and subsequently in our cases, in describing the reasonable suspicion standard under the Fourth Amendment. In Terry, the Supreme Court explicitly stated its holding, including the following language: "We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," an investigatory stop is warranted. Terry, 392 U.S. at 30 (emphasis added). Some later cases utilize the same conditional language. See, e.g., Sokolow, 490 U.S. at 7 ("may be afoot");

15

<u>Arvizu</u>, 534 U.S. at 273 ("may be afoot").

However, other reasonable suspicion cases have included more definitive language, suggesting that circumstances must indicate that criminal activity <u>is</u> afoot, or that a suspect <u>is</u> involved in criminal activity.  These cases include <u>Brown v. Texas</u>, 443 U.S. 47, 51 (1979) ("is involved in criminal activity") and <u>Wardlow</u>, 528 U.S. at 123 ("criminal activity is afoot").

This disparity is reflected in our cases.  <u>Compare, e.g.</u>, <u>Moore</u>, 276 Va. at 757, 668 S.E.2d at 155 ("may be afoot"); <u>McCain v. Commonwealth</u>, 275 Va. 546, 552, 659 S.E.2d 512, 516 (2008) ("may be afoot") <u>with</u> <u>Harris</u>, 276 Va. at 697, 668 S.E.2d at 147 ("is involved in criminal activity"); <u>Bass</u>, 259 Va. at 475, 525 S.E.2d at 923 ("is afoot").  In at least one case, both kinds of language are used in subsequent sentences.  <u>See</u> <u>Ewell</u>, 254 Va. at 217, 491 S.E.2d at 722–23 ("In order to justify the brief seizure of a person by an investigatory stop, a police officer . . . must have a reasonable suspicion, based on objective facts, that the [person] <u>is</u> involved in criminal activity.  In determining whether a police officer had a particularized and objective basis for suspecting that the person stopped <u>may be</u> involved in criminal activity, a court must consider . . . ." (emphases added) (citations and quotation marks omitted)).

These examples suggest that there may be little theoretical difference between the two constructions.  However, semantic differences can come to acquire great practical importance over time.  The more definite language of the latter line of cases could be easily misconstrued as a requirement that police officers have

16

some certainty that criminal activity in fact is about to commence, is already underway, or has recently concluded. Terry and its progeny do not go so far, but the conclusion reached by the majority here suggests that it has.

If so, this heightened requirement forecloses a vast range of legitimate investigatory practices, authorized by Terry, that result in only "minimal intrusion." Far from allowing officers the limited ability to request clarification when confronted with ambiguous circumstances, it places a weighty and unwarranted burden of proof on police to postpone any encounter until criminal culpability, or at the very least probable cause to suspect a crime is underway, can be conclusively established. This is not the holding of Terry or the cases that have followed it, and the majority's implementation of this foreign requirement, which is implicit in its resolution of this case, is error.

In this case, the majority does not properly apply the principles articulated by the United States Supreme Court in evaluating Terry stops. The United States Supreme Court has long made clear that states are permitted to provide greater protections to their citizens than the minimal levels guaranteed by the federal Constitution; however, they must do so by means of state law, whether embodied in state statute or state constitution. Danforth v. Minnesota, 552 U.S. ___, ___, 128 S.Ct. 1029, 1046 (2008) (citing Oregon v. Hass, 420 U.S. 714 (1975); Tarble's Case, 80 U.S. 397 (1872); Ableman v. Booth, 62 U.S. 506 (1859)). States are free to "impose higher standards on searches and seizures than required by

17

the Federal Constitution," but this must be accomplished by state law.  <u>Virginia v. Moore</u>, 553 U.S. \_\_\_, \_\_\_, 128 S.Ct. 1598, 1604 (2008) (quoting <u>Cooper v. California</u>, 386 U.S. 58, 62 (1967)).

IV. Conclusion

For all the forgoing reasons, I believe the Court of Appeals was correct in affirming the trial court's denial of Rudolph's motion to suppress and in affirming his conviction.  Accordingly, I would affirm the judgment of the Court of Appeals.


This order shall be published in the Virginia Reports and shall be certified to the Court of Appeals and the said circuit court.

A Copy,

Teste:


Patricia L. Harrington, Clerk

18