PRESENT:  Goodwyn, Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Millette, S.J.

PATRICK DARNELL HILL

v.  Record No. 180681

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE D. ARTHUR KELSEY
AUGUST 30, 2019

FROM THE COURT OF APPEALS OF VIRGINIA

The trial court convicted Patrick Darnell Hill of possession of cocaine with intent to distribute, second offense, upon his conditional guilty plea under Code § 19.2-254.  He appealed to the Court of Appeals, claiming that the trial court erroneously denied his pretrial motion to suppress.  The Court of Appeals disagreed and affirmed, *see Hill v. Commonwealth*, 68 Va. App. 610, 621, 625 (2018), as do we.

I.

A.

"On appeal, we state the facts 'in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences.'"  *Commonwealth v. White*, 293 Va. 411, 413-14 (2017) (citation omitted).  "This standard requires us 'to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'"  *Id.* at 414.  We also presume — even in the absence of specific factual findings — that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence.  *See Fitzgerald v. Commonwealth*, 223 Va. 615, 627-28 (1982) (noting that "[a]bsent a statutory mandate, . . . a trial court is not required to give findings of fact and conclusions of law" in support of a denial of a motion to suppress); *cf. Bowman v. Commonwealth*, 290 Va. 492, 500 & n.8 (2015)

(explaining that when an appellate court is "faced with a record of historical facts that supports conflicting inferences," the court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of that prosecution, and must defer to that resolution" (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)) (citing *Wright v. West*, 505 U.S. 277, 296-97 (1992) (plurality opinion))).

"When considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial." *White*, 293 Va. at 414 (collecting cases). But when an appellate court considers whether to "revers[e] a criminal conviction based on an erroneous pretrial ruling," evidence or proffers at trial are "relevant only if the defendant renews his pretrial motion at trial." *Id.* at n.2. A renewal of the motion is required to "satisfy Rule 5:25 by inviting the trial court to reconsider its pretrial ruling in light of the actual evidence presented — rather than merely relying solely upon the charging documents, pretrial proffers of the parties, or cursory evidentiary presentations as the trial court sometimes must do when deciding the issue prior to trial." *Id.*[1]

B.

On April 5, 2016, two detectives were patrolling the "600 block of Newport Avenue in the City of Portsmouth, which is a high crime, drug area," J.A. at 6; *see id.* at 12, 16, 22, while

---

[1] *See also Holloman v. Commonwealth*, 65 Va. App. 147, 158 (2015); *Allen v. Commonwealth*, 58 Va. App. 618, 621 (2011); *accord United States v. Ross*, 510 F.3d 702, 711-12 (7th Cir. 2007); *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002). *See generally* 5 Wayne R. LaFave et al., Criminal Procedure § 17.3(d), at 60 (4th ed. 2015) ("Failure to renew the motion at trial . . . at a minimum is likely to limit appellate review to the question of whether the judge properly decided the pretrial motion on the facts then available to him.").

For these reasons, we will not consider the prosecutor's proffer in response to Hill's guilty plea on the day of trial because Hill did not renew his motion to suppress at that time, and thus, the trial court had no occasion to reconsider its prior ruling.

"investigating some narcotics complaints," *id.* at 21. Both detectives worked in the Special Investigations Unit specializing in narcotics transactions. *See id.* at 12, 22. The two detectives had a combined experience of over 28 years, nearly 7 of which they had spent investigating narcotics transactions. *See id.* In that same "high drug, high crime area," one of the detectives had "made several [arrests] . . . , mostly right behind that area." *Id.* at 22.

In this "secluded" high-crime, high-drug area, *id.* at 16, the detectives saw Hill sitting alone in the driver's seat of a parked car. He was "leaning back in the seat watching" and not "moving around." *Id.* at 20. The detectives made a U-turn and observed Hill for approximately "a minute or so." *Id.* at 22. As the detectives pulled up near Hill's vehicle, Hill began "looking up and down, up and down, and he was constantly doing a bunch of movement inside of the vehicle." *Id.* at 7. The detectives pulled up "right beside [Hill's] vehicle" and parked approximately 25 feet away without using any lights or sirens. *Id.* at 9-10. Wearing their "police vest[s]" and "badge[s] of authority," *id.* at 5, 10, 21; *see id.* at 23, the detectives walked up to Hill "on the driver's side of the vehicle, *at which time when* [*they*] *approached* [Hill], he put his left hand on the steering wheel and then . . . . he turned his back and head away from [them]" and "began digging with his right hand between . . . . the driver's seat," *id.* at 7 (emphasis added); *see id.* at 11, 19.

When the detectives "walked up" to Hill, he "looked up towards" the detectives and "immediately went towards the back of the car." *Id.* at 24. "[H]e hunched over behind the driver's seat and [went] into the back seat area with his right hand." *Id.* Fearing that Hill might be reaching for a weapon, the detectives shouted: "Show us your hands, show us your hands," *id.* at 7; *see id.* at 11, 18, 24-25, and "[l]et's see your hands, let's see your hands," while identifying themselves as police officers, *id.* at 24. The detectives recalled shouting this

3

command approximately 7 to 10 times. *See id.* at 11, 25. They were both "concerned for [their] safety." *Id.* at 26; *see id.* at 18.

While a detective was telling Hill, "Show me your hands, show me your hands," Hill "*kept digging* around inside the vehicle." *Id.* at 11 (emphasis added). He turned his back to the detective and put "his head down in the vehicle as he was *digging down, reaching*." *Id.* (emphasis added); *see id.* at 8. As Hill was "digging down," *id.*, one of the detectives opened the driver's door and "grabbed [him] by his left forearm" as Hill "*continued* to pull away and dig down between the seats." *Id.* at 7-8 (emphasis added); *see id.* at 11. The seizing detective "thought [Hill] had a firearm" given "the way he was acting and the way he was pulling away, reaching." *Id.* at 11. Immediately after the seizure, the detective "informed" Hill that he "thought [Hill] may have been *reaching for a firearm*." *Id.* at 18 (emphasis added). While the detective did not see a firearm, he understood that "if there was a firearm in that vehicle that it would have been concealed." *Id.* at 19.

One of the detectives immediately checked "under the driver's seat in the same area the subject was reaching" and discovered "a clear plastic baggie containing cocaine." *Id.* at 8. Hill was subsequently arrested and indicted for possession of cocaine with intent to distribute. Hill moved to suppress the cocaine, but the trial court denied the motion. The trial court held that Hill "did certain actions within the car that [the detectives testified] made them feel like they were in danger based on his actions" and that "[t]he officers acted properly and in a constitutional manner and had reasonable suspicion for what they did." *Id.* at 55. The Court of Appeals affirmed this decision, and Hill now continues his challenge to the trial court's denial of his motion to suppress on appeal to this Court.[2]

---

[2] The Court of Appeals held that Hill only challenged his personal seizure as a predicate

4

II.

Hill argues on appeal that the detectives seized him in violation of the reasonable-suspicion standard adopted in *Terry v. Ohio*, 392 U.S. 1 (1968). His assignment of error asserts that the detectives "lacked a reasonable, articulable suspicion that [he] was engaged in criminal activity when he was found in a high crime area and did not respond to the officers' commands to show his hands." Appellant's Br. at 1. This argument rests on two assumptions: First, that the seizure in this case occurred when Hill refused to "show his hands,"[3] and second, that a *Terry* seizure can take place only when the suspect is "engaged in criminal activity," *id.* We disagree with both assumptions.

A.

A Fourth Amendment seizure of a person occurs either by physical force or submission of the person to the assertion of law enforcement authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *see also Hall v. Commonwealth*, 280 Va. 566, 570-71 (2010); *Bristol v. Commonwealth*, 272 Va. 568, 573 (2006); *McCain v. Commonwealth*, 261 Va. 483, 491 (2001). The detectives' commands for Hill to show his hands did not, by themselves, result in a seizure because Hill never submitted to this assertion of authority. Well-established caselaw supports

---

for the search of the vehicle, not the search of the vehicle itself, *see Hill*, 68 Va. App. at 616 n.1, and Hill does not challenge that ruling to this Court. Rule 5:17(c)(1)(iii) requires an assignment of error to "address the findings, rulings, or failures to rule on issues in the trial court or other tribunal from which an appeal is taken." *See Parker v. Carilion Clinic*, 296 Va. 319, 332 (2018). When an appellant "fails to assign error to a particular holding," we treat it as "binding on appeal." *Egan v. Butler*, 290 Va. 62, 79 (2015) (citation omitted). Thus, the scope of our review is limited to Hill's challenge of his personal seizure as a predicate for the search of the vehicle.

[3] *See* Oral Argument Audio at 4:41 to 4:58 ("I feel like he was seized when they were at the car, and they were yelling at him, telling him to stop or, excuse me, to show [his] hands because at that point he was not free to leave. He did not — A reasonable person would not feel that they were free to leave at that point."); *id.* at 29:00 to 29:46 ("On behalf of my client, I would say that the Fourth Amendment seizure occurred when they started telling him to get out of the car, or excuse me, show his hands.").

5

this conclusion. *See, e.g.*, *United States v. Waterman*, 569 F.3d 144, 146 (3d Cir. 2009) (holding that no seizure occurred when police drew their guns and ordered the defendant to raise his hands but he refused to do so and subsequently entered a house); *United States v. Valentine*, 232 F.3d 350, 353, 359 (3d Cir. 2000) (holding that no seizure occurred even when the defendant "momentarily 'complied'" with an officer's order to "come over and place his hands on the car" by stopping and saying "Who, me?"); *United States v. Johnson*, 212 F.3d 1313, 1316-17 (D.C. Cir. 2000) (holding that no seizure occurred "after [the defendant]'s first 'shoving down' motion, when [the officer] drew his gun and ordered [the defendant] to raise his hands" because the defendant did not submit to the officer and "continued to make 'shoving down' motions, gestures that were the very opposite of complying with [the officer]'s order").[4]  Contrary to Hill's first assumption, therefore, the detectives did not seize Hill until the moment they physically placed their hands on him and pulled him from the vehicle.

B.

This inquiry into the timing of the seizure highlights Hill's second mistaken assumption — that an officer must be investigating a crime already in progress.[5]  As we recently

---

[4] *See generally* 5 Ronald J. Bacigal, Virginia Practice Series: Criminal Procedure § 3:2, at 39-41 (2018-2019 ed.) (acknowledging that a seizure does not occur without physical touching or submission to an officer's show of authority and that a defendant's failure to comply with an officer's command to "put your hands where I can see them" thus does not amount to a seizure (citing *Woodson v. Commonwealth*, 245 Va. 401, 405-06 (1993)); John L. Costello, Virginia Criminal Law and Procedure § 42.1[1], at 643 (4th ed. 2008) (noting that "there is a definite area on the spectrum between no intrusion into freedom and the *Terry* investigative stop in which the police may operate to inquire into the conduct of citizens without articulable suspicion or probable cause, *so long as they do not effect a seizure of the person*" (emphasis in original)).

[5] *See* Appellant's Br. at 1 (assigning error to the trial court's denial of Hill's motion to suppress because "the officers lacked a reasonable, articulable suspicion that [Hill] *was engaged in criminal activity*" (emphasis added)); *id.* at 7-8 ("[Detective] Hunter testified that he could not articulate *any crime that the Defendant was committing*." (emphasis added)); *id.* at 8 ("When questioned about the illegality of [Hill's] actions, Hunter further stated that [*Hill's*] *actions of placing his left hand on the steering wheel and turning his back and head away from the officers*

6

pointed out, "[i]n the seminal case *Terry v. Ohio*, an investigative stop was held objectively reasonable where the officer observed no elements of any crime whatever, but only an entirely lawful course of conduct which gave rise to a reasonable suspicion that the defendant was *preparing to commit a crime*." *Mason v. Commonwealth*, 291 Va. 362, 369 (2016) (emphasis added). We also noted that "[t]he Supreme Court reached the same result in *United States v. Sokolow*, where the defendant also engaged in a lawful course of conduct that nevertheless led an officer reasonably to conclude that *a crime was intended*." *Id.* (emphasis added) (citing *United States v. Sokolow*, 490 U.S. 1, 5, 8-11 (1989)). Succinctly put, *Terry* authorizes a seizure of a suspect who "is, or *is about to be*, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981) (emphasis added); *see also Navarette v. California*, 572 U.S. 393, 401 (2014). Thus, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Sokolow*, 490 U.S. at 10 (citation omitted).

The issue in this case is not, as Hill assumes, whether the officers (both experienced detectives) had reasonable suspicion to believe that Hill was a drug dealer and thus had the

---

*were not illegal*." (emphasis added)); *id.* ("In corroboration of Hunter's testimony, [Detective] Whitson testified that when they said 'Show me your hands' to [Hill], *he had not done anything illegal*." (emphasis added)); *id.* at 9 ("Even viewing the evidence in the light most favorable to the Commonwealth, [Hill's] mere presence in a parked vehicle in a high crime area, *coupled with the officers' testimony that* [*Hill*] *was not engaged in criminal activity*, are insufficient to justify a *Terry* stop." (emphasis added)); *id.* ("When the officers approached [Hill], their first statements to him were 'show us your hands' even though both state [*Hill*] *was not engaged in criminal activity*." (emphasis added)); *see also* Oral Argument Audio at 1:14 to 1:32 (arguing that when the detectives approached Hill, they "did not observe Mr. Hill doing anything illegal [and] did not observe anything illegal with respect to the vehicle"); *id.* at 5:46 to 5:50 ("I would argue that they did not have reasonable, articulable suspicion that a crime *was occurring*." (emphasis added)); *id.* at 28:12 to 28:35 (arguing that the testimony of one of the detectives shows that Hill "did not appear to be doing anything illegal" when they made the U-turn, or when they started walking toward the vehicle, or when they initially commanded Hill to show his hands).

7

authority to seize him to find out whether that suspicion was correct before performing a protective search for weapons. Hill was a drug dealer (he pleaded guilty to possessing cocaine, second offense, with intent to distribute), but we will assume arguendo that at the time of the seizure the detectives had only a hunch, albeit a good one, that Hill was one. The proper focus, however, is "the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry*, 392 U.S. at 23.

*Terry* established a degree-of-certitude standard — reasonable suspicion — to govern an officer's protected interest in assuring his own safety. *Terry* set this standard with a simple fact pattern. At 2:30 p.m., a police officer observed Terry and his companions repeatedly walking back and forth, looking into a store window, and conferring with one another. *See id.* at 6. The officer "was unable to say precisely what first drew his eye to them." *Id.* at 5. But the officer had "been assigned to patrol this vicinity" for 30 years looking for "shoplifters and pickpockets." *Id.* The curious back-and-forth movements by the men on a public walkway while peering into a store window made the officer suspect that they were "casing a job, a stick-up," and "he feared 'they may have a gun.'" *Id.* at 6. After Terry and his companions "had departed the original scene," *id.* at 28, the officer walked up to the men, identified himself as a police officer, asked for their names, and when they "mumbled something," immediately patted them down and found two handguns, *id.* at 6-7.

The Supreme Court in *Terry* upheld the officer's actions based upon his underlying duty of "effective crime prevention and detection." *Id.* at 22. It did not matter that each act within "the series of acts" by Terry and his companions was "perhaps innocent in itself" because "taken together" the acts "warranted further investigation." *Id.*; *see also United States v. Arvizu*, 534

8

U.S. 266, 274 (2002). "Even though the suspicious individuals walking up and down the sidewalk 'could simply have been innocuous, albeit overly energetic, window shoppers,' that hypothesis of innocence 'did not invalidate the *Terry* stop.'" *Shifflett*, 58 Va. App. 732, 737 (2011) (citation omitted). Nor did it matter that the officer had suspected that Terry and his companions may be armed and dangerous when he approached because the officer was discharging a "legitimate investigative function . . . when he decided to approach [Terry] and his companions." *Terry*, 392 U.S at 22.

Despite these seemingly innocuous circumstances, the Supreme Court in *Terry* concluded that the police officer "had observed enough to make it quite reasonable to fear that [Terry and his companions] were armed; and nothing in their response to his hailing them, identifying himself as a police officer, and asking their names served to dispel that reasonable belief." *Id.* at 28. The seizure was not "the product of a volatile or inventive imagination," nor was it "undertaken simply as an act of harassment." *Id.* Rather, the seizure was "the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." *Id.*

## C.

Properly framed, the ultimate issue in this case is whether, at the time of the seizure, the detectives had reasonable suspicion to believe that *they were about to be assaulted with a weapon*. Brandishing a weapon is a crime, *see* Code § 18.2-282, as are attempted unlawful or malicious wounding, *see* Code §§ 18.2-26, -51, and attempted murder, *see* Code §§ 18.2-26, -32. The answer to this question turns on whether the detectives could have reasonably suspected that that Hill *may have been* reaching for a weapon. If so, the crime that was seconds away from

9

taking place *could have been* a shooting or, if they were lucky, merely a brandishing of a weapon.

We emphasize "may have been" and "could have been" because these phrases reflect the appropriate probabilistic formulation. *Terry* did not require that the detectives be confident that Hill *was in fact* reaching for a weapon with the *probable intent* to use it. The degree of certitude required for "'reasonable suspicion' is 'considerably *less* than proof of wrongdoing by a preponderance of the evidence,' and 'obviously *less* demanding than that for probable cause.'" *Perry v. Commonwealth*, 280 Va. 572, 581 (2010) (emphases added) (quoting *Sokolow*, 490 U.S. at 7). The reasonable suspicion standard "is not an exacting one," *Braun v. Maynard*, 652 F.3d 557, 561 (4th Cir. 2011), and the "mere 'possibility of an innocent explanation'" does not necessarily exclude a reasonable suspicion that criminal activity is afoot, *Shifflett*, 58 Va. App. at 736 (citation omitted); *see Arvizu*, 534 U.S. at 274 (rejecting the "divide-and-conquer analysis" that cycles through potentially innocent interpretations because *Terry* precludes it).[6]

1.

At the suppression hearing, the prosecutor argued that the detectives had reasonably suspected that Hill was "reaching" for something, which "could be a weapon" in the vehicle. J.A. at 51-52. He made this argument based upon the detectives' testimony that, as they were

---

[6] *See also District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (finding that "view[ing] each fact 'in isolation, rather than as a factor in the totality of the circumstances'" is "mistaken in light of our precedents" and that "[t]he 'totality of the circumstances' requires courts to consider 'the whole picture'" because "the whole is often greater than the sum of its parts — especially when the parts are viewed in isolation" (citations omitted)); *Navarette*, 572 U.S. at 403 ("[W]e have consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" (citation omitted)); *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (noting that "[e]ven in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation"). *See generally* 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.5(b), at 660-65 (5th ed. 2012) [hereinafter LaFave, Search and Seizure].

10

shouting 7 to 10 times to Hill "show me your hands," Hill turned his back to them and put "his head down in the vehicle as he was *digging down, reaching*." *Id.* at 11 (emphasis added); *see id.* at 8. The seizing detective "thought [Hill] had a firearm" given "the way he was acting and the way he was pulling away, reaching." *Id.* at 11. Immediately after the seizure, the detective "informed" Hill that he "thought [Hill] may have been *reaching for a firearm*." *Id.* at 18 (emphasis added). While the detective did not see a firearm, he understood that "if there was a firearm in that vehicle that it would have been concealed." *Id.* at 19. Accepting this testimony, the trial court held that Hill "did certain actions within the car that [the detectives testified] made them feel like they were in danger based on his actions" and that "[t]he officers acted properly and in a constitutional manner and had reasonable suspicion for what they did." *Id.* at 55.

The contextual facts amply support the trial court's findings. Two experienced narcotics detectives walked up to Hill while he was parked alone on a secluded street in a high-crime, high-drug area of Portsmouth. Hill's up-and-down glances and his curious movements within the vehicle drew the detectives' attention when they pulled their vehicle beside Hill's and observed him for approximately a minute. As soon as they began walking the approximately 25 feet from their parked vehicle to Hill's, while wearing their police vests and badges, Hill turned away from them and started digging frantically between the driver's and passenger's seats. Concerned for their safety, the detectives repeatedly told Hill (as many as 7 to 10 times) to show his hands. He refused by saying nothing and not even looking at the detectives again as he continued digging. What was he digging for? A misplaced identification card, a parking pass, a breath freshener, or a pack of cigarettes — all while two detectives, obviously sensing danger, were shouting at him to show his hands?

11

As it turns out, Hill was reaching for his stash of cocaine. But the detectives did not know that at the time. They feared that Hill was reaching for a weapon, and they had to make a split-second decision. Doing nothing risked the possibility of being shot at point-blank range. Walking away risked the possibility of being shot in the back. The detectives thus did what any experienced police officer would and should do in this situation — physically seize the man and separate him from the potential weapon. These "legitimate and weighty" risks cannot be ignored given "the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). To police officers, it is a matter of life and death. "According to one study," the Supreme Court has observed, "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 148 n.3 (1972)).

Considering the totality of these circumstances, the detectives in this case had the same practical, experience-based concern for their safety as the police officer had in *Terry*. In our case, as in *Terry*, the detectives were not required to "be absolutely certain that the individual [was] armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. The requisite level of *belief*, when calibrated to reasonable suspicion, is less than probable cause, less than a preponderance, and certainly less than beyond a reasonable doubt. All that is required is a *suspicion* — a reasonable one that is not "the product of a volatile or inventive imagination" or one "undertaken simply as an act of harassment." *Id.* at 28. The detectives had such reasonable suspicion here.

2.

In analogous circumstances, many courts have reached similar conclusions. Consider, for example, *United States v. Johnson*, in which two officers were driving an unmarked vehicle in "a high narcotics area" when they saw a parked vehicle with two people inside and a woman leaning inside the passenger's window and handing an object to Johnson. 212 F.3d 1313, 1314-15 (D.C. Cir. 2000). The officers parked their vehicle "about 25 feet away" and approached the vehicle that they had observed. *Id.* at 1317. One of the officers saw Johnson make a "'shoving down' motion, leading him to believe that Johnson might be armed." *Id.* at 1315. The officer drew his gun and shouted at Johnson, "Let me see your hands," a command with which "Johnson did not immediately comply but rather made 'a couple of more shoving motions down' before raising his hands." *Id.* The officer then reached inside the vehicle and felt a bulge inside of Johnson's pants pocket, which turned out to be crack cocaine. *See id.*

The court in *Johnson* held that a seizure had not occurred "after Johnson's first 'shoving down' motion, when [the officer] drew his gun and ordered Johnson to raise his hands" because "Johnson had not submitted to" the officer's "show of authority." *Id.* at 1316. Johnson instead "continued to make 'shoving down' motions, gestures that were the very opposite of complying with [the officer]'s order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun," and "by the time the stop actually took place, it was supported by Johnson's continued suspicious gestures in response to being confronted by a police officer." *Id.* at 1316-17. The court concluded that these gestures were "suspicious enough to support a reasonable belief that Johnson may have been engaged in criminal activity." *Id.* at 1317.

In another example, *United States v. Waterman*, officers investigated an anonymous tip regarding someone with a gun at a particular residence. *See* 569 F.3d 144, 144 (3d Cir. 2009). The officers approached the residence and observed five people standing on the porch. *See id.* at 145. One of the officers ordered everyone to put their hands in the air, and everyone complied except for Waterman, who kept his hands in his jacket pockets. *See id.* Although the officer did not see a weapon in Waterman's hands, the officer "suspected that [he] might have been armed because he had moved his hands toward his waistband." *Id.* After drawing their firearms and "repeatedly command[ing] [Waterman] to put his hands in the air," Waterman "did not comply" and "moved one of his hands behind his back and turned the doorknob on the front door," which "didn't open." *Id.* The officer "continued, unsuccessfully, to order [Waterman] to show his hands," but someone inside the house opened the door, which allowed Waterman to enter the house. *Id.* The officer put his leg in the doorway to keep the door from shutting, and guns and drugs were later recovered in the residence. *See id.* The court held that there had been no application of physical force when the officers drew their guns and that Waterman had not submitted to the officers' show of authority when he failed to raise his hands in compliance with their commands. *See id.* at 146. As a result, Waterman was not unlawfully seized on the porch, and thus, the contraband discovered in the residence thereafter did not need to be suppressed. *See id.* The court noted that if the "police [had] effected a 'seizure' on the porch, Waterman's rights would have been violated because the anonymous tip did not provide officers with a reasonable suspicion that he was armed." *Id.*

In another analogous case, *United States v. Mosley*, the court found reasonable suspicion for a *Terry* stop when the defendant had refused to comply with officers' commands to put his hands up and instead "quickly began making furtive motions with his right shoulder and arm."

14

743 F.3d 1317, 1321 (10th Cir. 2014). The defendant eventually complied by raising his hands, and an officer pulled him from the car and detained him. *See id.* at 1321-22. A search underneath the defendant's seat revealed a handgun. *See id.* at 1322. The court found that "by the time Defendant was seized within the meaning of the Fourth Amendment, the officers possessed the requisite reasonable suspicion to justify a *Terry* stop." *Id.* at 1323. The court concluded that the "[d]efendant did not simply remain seated; rather, he began making furtive motions consistent with hiding — or worse, retrieving — a gun." *Id.* at 1327. These actions "did not manifest submission; quite the opposite, Defendant went from sitting still before being confronted by the officers, to moving furtively, directly contrary to the officers' commands." *Id.*

Including the cases already discussed, at least seven federal circuit courts of appeals have considered similar facts and came to similar results. *See, e.g.*, *United States v. Roberson*, 864 F.3d 1118, 1120, 1124-26 (10th Cir. 2017) (finding reasonable suspicion to conduct a *Terry* stop and frisk when officers engaged in a consensual encounter with a man in a parked vehicle who began to make "'stuffing motions' underneath the driver's seat" as the officers approached the vehicle and who did not immediately comply with officers' commands to show his hands); *Williams v. Decker*, 767 F.3d 734, 737, 739-41 (8th Cir. 2014) (finding reasonable suspicion for a *Terry* stop and frisk when officers approached a parked vehicle and when the passengers saw the officers, they "began moving around while keeping their hands concealed from the officers' view" and did not comply promptly with the officers' commands to show their hands); *United States v. Morgan*, 729 F.3d 1086, 1089-90 (8th Cir. 2013) (finding reasonable suspicion for a *Terry* stop and frisk when officers spotted a vehicle with tinted windows in which the occupants were "ducked down," the driver "reached under his seat with both hands" as the officers approached the vehicle to "see what was going on," and the driver did not immediately comply

with commands to show his hands); *United States v. Mays*, 643 F.3d 537, 539-40, 542-43 (6th Cir. 2011) (finding that reasonable suspicion existed for a *Terry* stop and protective search when the defendant stopped his approach toward the officers after realizing that they were police, put his hands in his pockets, began "digging" in his pockets, and then reached for his waistband and continued digging when ordered to remove his hands from his pockets because "a nervous defendant who is 'digging' into his pants for a weapon could be more dangerous than one that is attempting to leave the scene"); *United States v. Pearce*, 531 F.3d 374, 382-83 (6th Cir. 2008) (finding reasonable suspicion for a *Terry* stop and frisk when an officer "entered a known high-crime area" and "observed [the defendant] exit a vehicle, glance towards him, hunch over, place his right hand in the small of his back, and start backing away" and concluding that while this behavior may be "susceptible of an innocent explanation," such as "trying to put his wallet away," it "might also have been reasonably viewed as an attempt to conceal a weapon and/or other contraband material, such as narcotics, from a police officer who had just appeared on the scene"); *United States v. Morgan*, 34 Fed. Appx. 141, 141-42 (4th Cir. 2002) (per curiam) (finding reasonable suspicion for a *Terry* stop when the defendant "acted suspiciously" as an officer approached by keeping "his hands in front of him, out of view, and ignor[ing] the officer's requests to turn around and show him his hands"); *United States v. Denney*, 771 F.2d 318, 319, 321-22 (7th Cir. 1985) (finding reasonable suspicion for a *Terry* stop and frisk when the defendant rapidly drove toward the premises of a police raid, skidded to a halt, and did not comply with an officer's command to raise his hands and exit the vehicle but instead "made a motion toward the center of the truck," which the officer "reasonably interpreted was consistent

16

with reaching for a weapon" and which "compounded the officers' belief that violence was imminent").[7]

3.

To be clear, we are not suggesting that the detectives would have been justified in seizing Hill if he had simply remained still and refused to show his hands when the officers commanded him to do so. *See, e.g.*, *United States v. Lowe*, 791 F.3d 424, 428, 433-35 (3d Cir. 2015) (finding no reasonable suspicion to conduct a *Terry* stop and frisk when the defendant did not take his hands out of his pockets when asked to do so and appeared "frozen" or "shocked" in response and merely "looked both ways over his shoulders"); *United States v. Burton*, 228 F.3d 524, 526, 528-29 (4th Cir. 2000) (finding no reasonable suspicion to conduct a *Terry* stop and frisk when officers, who were serving outstanding warrants, approached a man standing by a pay phone, asked him for identification, and when he did not respond, asked him twice to remove his right hand from his coat pocket, which the man failed to do).

Rather, in this case, Hill's physical response to the detectives' multiple commands that he show his hands — a clear and sustained expression of fear for their personal safety — shows why the seizure was justified. Hill turned his back to the obviously fearful detectives, started digging with his right hand and arm in an area not visible to them and in a manner that gave the detectives reasonable suspicion that he might be reaching for a weapon. The point is not simply

---

[7] *See generally* 4 LaFave, Search and Seizure, *supra* note 6, § 9.5(g), at 707-14, 709 n.260 (5th ed. 2012 & Supp. 2018-2019) (noting that it is a "rather common situation" when "police suspicions are based in whole or in part upon the reactions of the suspect in response to the appearance of police in the vicinity"; that "[p]olice are trained to be suspicious of such reactions, and stops are not infrequently made because of them"; and that manifestations of concern for the presence of police, such as "repeatedly glanc[ing] at the officer," and reactions, such as "furtive gestures consistent with hiding or retrieving a weapon in response to being confronted by police officers," often amount in the totality to reasonable suspicion for a stop (footnotes omitted)).

that Hill *may have had a weapon* — but that he was quite possibly in the very act of *reaching for a weapon* at the very moment that the detectives were plainly expressing their concern that he might be doing so. It does not matter that, prior to the precise moment of the seizure, the detectives may have lacked grounds to seize Hill on suspicion of a drug crime. "If [an] officer has commenced a nonseizure confrontation without a pre-existing reasonable suspicion supporting a frisk, but such suspicion suddenly appears (most likely because of the suspect's conduct), then the officer is entitled to frisk for his own protection." 4 LaFave, Search and Seizure, *supra* note 6, § 9.6(a), at 843.

### III.

When viewed from the proper appellate perspective, the evidence shows that the detectives, at the time of the seizure, could have reasonably suspected that Hill was "digging" and "reaching" for a weapon while they shouted 7 to 10 times for him to show his hands. J.A. at 7, 11, 18-19, 25. They understandably feared that their lives might have been in danger. If "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Evans v. Commonwealth*, 290 Va. 277, 289 (2015) (citation omitted), then there was nothing unreasonable about the detectives briefly seizing Hill either to confirm or to dispel their suspicion. The gravity of the risk was too great to do otherwise.

The trial court correctly denied Hill's motion to suppress, and the Court of Appeals correctly affirmed that decision.

*Affirmed.*

18

SENIOR JUSTICE MILLETTE, with whom JUSTICE MIMS joins, dissenting.

I agree with the majority that "the ultimate issue in this case is whether, at the time of the seizure, the detectives had reasonable suspicion to believe that *they were about to be assaulted with a weapon*." *Ante* at 10. Because I find the facts in the record insufficient to establish an objectively reasonable basis for this belief, I respectfully dissent.

A defendant's claim that a seizure occurred in violation of the Fourth Amendment presents a mixed question of law and fact that we review de novo. *Bolden v. Commonwealth*, 263 Va. 465, 470 (2002); *McCain v. Commonwealth*, 261 Va. 483, 489 (2001); *see Ornelas v. United States*, 517 U.S. 690, 691, 699 (1996). "In making such a determination, we give deference to the factual findings of the trial court and *independently determine* whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." *Murphy v. Commonwealth*, 264 Va. 568, 573 (2002) (citing *Bolden*, 263 Va. at 470; *McCain*, 261 Va. at 490) (emphasis added). I do not disagree with the majority on the essential historical facts. I differ on the application of law to the totality of these facts, when reviewed de novo.

## I. Search for Weapons as the Basis for a Stop

"[A]n officer may not conduct a protective search to allay a reasonable fear that a suspect is armed without *first* having a reasonable suspicion that supports an investigatory stop." *United States v. Mayo*, 361 F.3d 802, 806 (4th Cir. 2004) (emphasis added). Absent a reasonable suspicion of criminal activity, "a police officer may not simply approach a citizen, as part of a police-citizen encounter, and frisk the citizen because the officer believes that his safety is at risk." *Id.* at 807; *Terry*, 392 U.S. 392, 32–33 (1968) (Harlan, J., concurring) ("[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, *the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop*." (emphasis

added)); *see Adams v. Williams*, 407 U.S. 143, 146 (1972) ("*So long as* the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." (emphasis added) (footnote omitted)). *See, e.g.*, *United States v. Jones*, 606 F.3d 964, 966 (8th Cir. 2010) ("[T]he government leaped to the officer safety rationale for a protective frisk for weapons, ignoring the mandate in *Terry* that there must be reasonable suspicion of on-going criminal activity justifying a stop before a coercive frisk may be constitutionally employed." (emphasis omitted)); *Commonwealth v. Narcisse*, 927 N.E.2d 439, 445-46 (Mass. 2010) ("[W]e state expressly that police officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense and is armed and dangerous." (emphasis omitted)).

*Terry* recognizes two different government interests, weighed against two different intrusions on individual autonomy. *Terry*, 392 U.S. at 22-23. At the investigative stage, "effective crime prevention and detection" justifies an officer's approach of a person "in appropriate circumstances and in an appropriate manner" to investigate criminal behavior absent probable cause. *Id.* at 22. *Terry* allows the intrusion of a search incident to an investigative stop because an officer with reasonable suspicion that criminal activity is afoot is duty-bound to investigate, and the "immediate interest of the police officer in . . . assur[ing] himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him" justifies a search, as it would be "unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Id.* at 23.[1]

---

[1] In some situations, suspicion of certain criminal activity, such as commission of a robbery, may be a contributing factor in forming the articulable suspicion that the subject being detained may have a weapon, raising the likelihood of the need for a frisk or defining the scope

20

While searches incident to an investigative detention can result in a limited frisk based solely on the concern for officer safety, consensual encounters do not provide such leeway. This seeks to balance the need for effective officer safety against the recognition that "[e]ven a limited search of the outer clothing for weapons," much less, as in this case, a full bodily detention, "constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry*, 392 U.S. at 24-25.

Thus, when officers feel they must engage in a *Terry* seizure and search for weapons based on a belief that the citizen may wish to do them harm, *Terry* requires that the Commonwealth is obligated to advance not merely a general concern for officer safety, but also a particularized, articulable suspicion that an individual has committed, is committing, or is about to commit a criminal offense. *Id.* Assault of a police officer would most certainly be one such offense, but *Terry* requires that, beyond articulating their subjective belief that they felt fear of imminent assault, officers articulate the factual basis of that fear into the record. *Id.*

At issue here is whether the investigative seizure of Hill was lawful, because without the lawful seizure there can be no search. The officers here, at the time they left their unmarked cruiser, admitted they possessed no basis for suspicion other than their assessment that the somewhat secluded area might be conducive to a narcotics sale. However, that was insufficient to establish reasonable suspicion to justify a constitutional forcible stop. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that a person is

---

of an appropriate frisk. *See, e.g.*, *Terry*, 392 U.S. at 28 (where "men were contemplating a daylight robbery – which, it was reasonable to assume, would be likely to involve the use of weapons – and nothing in their conduct . . . gave [the officer] sufficient reason to negate that hypothesis").

21

committing a crime." (citation omitted)). Hill had been leaning back in his seat when they first observed him, doing some activity with his hands within the car, but nothing about this behavior suggested criminal activity.

Here, officers approached an individual whom they acknowledged was apparently doing no wrong, and whose expectation of his constitutional freedom from government intrusion was that of any innocent citizen. Officers claim that they subsequently developed a fear that he might harm them, and that fear provided the basis for seizing him. Accordingly, the Commonwealth must prove by a preponderance of the evidence that the officers had an objectively reasonable belief that Hill was armed and intended to do them harm—rather than merely exercising his constitutional right to decline their attempt at a consensual encounter. *See Brown v. Texas*, 443 U.S. 47, 52 (1979); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).

## II. Review of the Record for Objective Standard

In evaluating the propriety of an investigative stop, we look to "'the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citation omitted). "Circumstances relevant in this analysis include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *McCain*, 275 Va. at 554.

I begin with the assessment of the area and time. Hill was parked in a luxury vehicle in the middle of the afternoon. Both officers had significant experience in narcotics investigations and were familiar with the area, which was characterized as a high crime, high drug area. Officer Whitson, the more experienced narcotics agent, stated his drug arrests were "mostly right

22

behind that area. We had a lot of operations targeting a specific address." When asked how many of his investigations involved firearms, Officer Whitson stated he did not recall any firearms being recovered in that area.[2] Thus, while the high crime, high drug area remains a factor to be considered, the salience of this factor is somewhat muted by the daylight hours and the plain testimony of the officer that he had not encountered firearms in his arrests there.

Turning to their interaction with the suspect individual: the officers were in an unmarked vehicle wearing plain clothes when Hill looked in their direction and subsequently turned away. Prior to officers engaging Hill, he turned and reached, and—before they attempted to knock on the window, identify themselves as officers, or otherwise announce themselves—the officers began shouting commands to show his hands.

The trial court made a single affirmative finding of fact during the suppression hearing: "[Hill] did certain actions within the car that their testimony was made [sic] [the officers] feel like they were in danger based on his actions." This is an assessment of the officers' subjective feelings, and "it is imperative that the facts be judged against an objective standard." *Terry*, 392 U.S. at 21-22. "[G]ood faith [on the part of the officer] is not enough. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, house, papers and effects,' only in the discretion of the police." *Beck v. Ohio*, 379 U.S. 89, 97 (1964) (internal quotation marks and citation omitted)). Thus, "in justifying the particular intrusion, the police officer must be able to point to specific

---

[2] While high drug activity areas often may correlate with areas where firearms are abundant, *see, e.g.*, *Jones v. Commonwealth*, 272 Va. 692, 701 & n.3 (2006) (noting that "the connection between illegal drug operations and guns in our society is a tight one") (quoting *United States v. Grogins*, 163 F.3d 795, 799 (4th Cir. 1998)), and the presence of drugs may often provide a fair inference that guns may be present, the Court should give full consideration to the area and circumstances of this specific neighborhood as presented in the record when considering the likelihood of a firearm under a totality of the circumstances standard.

23

and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *see Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979) ("[T]he reasonableness standard usually requires, at a minimum, that *the facts upon which an intrusion is based* be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." (emphasis added)).

> Such generalities as "he didn't look right" will not suffice; . . . the officer must relate what he has observed, and, when appropriate, indicate why his knowledge of the crime problem and the habits of the residents on his beat or of the practices of those planning or engaging in certain forms of criminal conduct gives special significance to what he observed. . . . [A] reasonably specific statement by an officer of the circumstances underlying his action – when considered together with how he in fact reacted to the situation which confronted him – afford an adequate basis for judicial review.

Wayne R. LaFave, Search and Seizure, § 9.5(a) at 652-53 (5th ed. 2014).[3]

"[I]n determining whether the officer acted reasonably . . . due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Whitaker v. Commonwealth*, 279 Va. 268, 274 (2010) (quoting *Terry*, 392 U.S. at 27). A "hunch" was exactly the word Officer Hunter used in his testimony to describe the level of suspicion the officers had at this stage. Word choice aside, the substance of the officers' testimony did not establish a factual basis from which a reasonable, objective factfinder could evaluate their actions to determine whether they were reasonable.

---

[3] *Compare Beasley v. Commonwealth*, 60 Va. App. 381, 386-87 (2012) (motion to suppress upheld where officer testified his "extensive experience" suggested the furtive hand to hand motions he witnessed among vehicle occupants tends to indicate "they have either had narcotics or a weapon in the vehicle,") *with Strange v. Commonwealth*, 269 S.W.3d 847, 852 (Ky. 2008) (police assertion that defendant's movements were suspicious was insufficient as "training and experience . . . should enable them to articulate the factors that aroused their suspicion,"), *and Crosby v. State*, 408 Md. 490, 510 (2009) (court found officer "did not explain" basis for belief that driver's "slumping down" manifests effort not be seen by police).

While both officers stated Hill was reaching and his hand was out of view, the record provides no further information as to why the officers formed the belief he was reaching for a weapon or, indeed, doing anything criminal. They did not describe Hill's demeanor as nervous or furtive or aggressive such that he might be hiding a weapon or about to draw a weapon on two police officers. Officer Whitson acknowledged that the item reached for "could have been anything," and Officer Hunter likewise testified "I had no idea what he was reaching for." As any individual with their hands in their pockets or obscured could be concealing "anything," and doing so legally, the Commonwealth must provide a record with objective reason to suspect criminal activity afoot.[4]

The average person could reasonably and innocently have been reaching for his wallet or identification in the presence of approaching police officers. And while innocent explanations do not alone undermine the basis for an investigative stop, they invite the question: why was it that the officers in this case believed there was nefarious activity occurring or about to occur? When the answer is not apparent in the record, the record provides an insufficient basis for objective assessment.

This Court does not require much by way of explanation: a general recitation of what might have made this individual or scenario seem particularly "dodgy" to an experienced officer, whether from events the officer observed or the individual's demeanor or the visible contents of his car will usually suffice. In this case, however, the officers presented no objectively

---

[4] We have said that "articulable" does not mean "articulated." *Mason v. Commonwealth*, 291 Va. 362, 368-69 (2016). Officers are not required to be experts in the law and may, in articulating their understanding for the basis of a stop, provide the facts to support a different legal reason why the stop is in fact proper. Nonetheless, a proper factual basis underlying the stop, whether by the officers or other testimony or other evidence, must be present in the record.

25

reasonable basis for suspecting Hill was involved in any criminal activity, including presenting a threat to them, when they began shouting their initial commands, other than the mere location.

I then turn to Hill's refusal to submit to the officers' authority. Because the officers had no basis for suspicion at the time they gave the commands, and Hill declined to submit to their authority, the refusal to respond to the commands must be treated as a refusal to engage in a consensual encounter. An individual's mere refusal to cooperate with police commands in a consensual encounter generally cannot be used against him. *Wardlow*, 528 U.S. at 125 *(citing Royer*, 460 U.S. at 498). However, suspicious behavior accompanying a refusal, such as "unprovoked flight," may form the basis of articulable suspicion. *Id.*

Here, Hill remained with his back to the officers but continued to reach between or under the seats. The refusal itself does not weigh against him, so it is necessary to look to whether his accompanying behavior provides a basis for suspicion that he was involved in legally wrongful activity. Again, the record is devoid of any description to allow a factfinder, either at trial or on appeal, to verify the officers' subjective assessments under an objective standard. There is nothing in the record to indicate that Hill was glancing back at the officers to gauge their location as he reached for something, in order that he might train a weapon on them or otherwise attack. There was nothing describing Hill's demeanor or his hand motions – whether nervous, frantic, furtive, covert, calculating, aggressive, or otherwise – as, in the opinion of experienced officers, indicative of someone about to take violent action, much less attempt violent action alone against two officers. Officer Hunter's testimony simply stated that he thought Hill had been reaching for a weapon because of "the way he was acting and the way he was pulling away, reaching." But the record does not include the essential elaboration as to *what way* Hill was acting or reaching. *See Brown*, 443 U.S. at 52 (improper stop where officer testified that suspect "looked

26

suspicious" but was unable to point to any facts supporting that conclusion). Similarly, the officer's retroactive statement to Hill after the seizure that he believed he might have had had a gun does not provide the Court with evidence as to the basis of that belief.

Where the record does not provide the factfinder with the objective basis for the officers' subjective assessment, we must reject the assessment as unsupported. The duty rests squarely on the Commonwealth to ask the requisite questions to establish that the officers' stop was proper.

While investigative seizures based solely on initial suspicion of weapons are not abundant, cases can nonetheless be found across Virginia jurisdictions with a similar or more robust degree of suspicious circumstance in which courts have found the seizures improper. *See, e.g.*, *United States v. Bryant*, 654 Fed. Appx. 622, 627-29 (4th Cir. 2016) (search improper despite knowledge of anonymous tip that defendant was armed, that he was convicted felon, and he reacted nervously to officer's presence); *United States v. Burton*, 228 F.3d 524, 528-29 (4th Cir. 2000) (search improper where police, while distributing outstanding warrants, requested identification from a defendant, who was standing at a pay phone with his hand in his pocket, declined to remove his hand so that they would feel secure); *United States v. Grant*, No. 4:11cr20, 2011 U.S. Dist. LEXIS 165396, at *1-5 (E.D. Va., Aug. 5, 2011) (granted motion to suppress when uniformed police approached a defendant in a high crime, high drug activity area based on suspicious bulge in left jacket pocket that seemed to weigh unnaturally and he postured so as to remain "slightly bladed" and kept his side obscured from officers); *Jackson v. Commonwealth*, 267 Va. 266, 670-72 (2004) (improper seizure despite car and occupants matching description of an anonymous tip that one occupant was brandishing a weapon, as well as observation of visible bulge under suspect's shirt and his refusal to cooperate with law enforcement); *Asble v. Commonwealth*, 50 Va. App. 643, 649 (2007) (where a suspect bending

toward a vehicle's center floorboard was insufficient to constitute suspicious activity absent evidence it was done as a furtive gesture with the intent of evading police).[5]

Here, we are left with a man sitting in a luxury vehicle in an area designated as high crime and high drug. Although crime and drugs clearly can be associated with firearm use generally, there was no testimony to that point in this place at that time. The interaction took place in broad daylight, and the individual had no known criminal background or affiliation. This man turned away from plain clothes officers approaching from an unmarked vehicle before they engaged him. He had no visible weapons or visible drug paraphernalia in the car nor any other evidence tending to indicate he was involved in any sort of criminal activity. He reached into a space the officers could not see before the officers engaged him, and continued reaching while they spoke. The officers state they became concerned for their safety, but there is nothing in the record to support a reasonable inference that his behavior was threatening, suspicious, furtive, aggressive, or calculated to harm the officers. Hill had, at the time of the seizure, not been observed doing any criminal activity which demonstrated an apparent need to fight or flee.

At best, the evidence in this case sits in equipoise. While the Commonwealth may be literally a scintilla short of meeting its standard, I believe that scintilla is critical to protecting citizens from implicitly biased searches and all officers of her courts against accusations of implicit bias. This evidence is insufficient to establish objectively reasonable suspicion that Hill was intending to assault officers with a weapon. The evidence does not rise to more than an inchoate hunch of criminal activity. The Commonwealth has failed to carry its burden. I respectfully dissent.

---

[5] I find the cases noted in the majority readily distinguishable, either because of the location and circumstances, such as noted common areas for violent crimes, or distinct legal postures, such as searches incident to a seizure or review under a qualified immunity standard.